**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BATYA ERICKSON**, Plaintiff, v. **CENTER CITY PUBLIC CHARTER SCHOOLS**, *et al.*, Defendants. | Case No. 1:25-cv-00053 (TNM) |

## <u>MEMORANDUM ORDER</u>

Batya Erickson worked as a school counselor for Center City Public Charter Schools ("Center City Schools") for nearly two school years before her employer declined to renew her contract for another term. Her two-year tenure was not a smooth ride. As her employer sees it, Erickson failed to schedule parent meetings, violated protocols for diagnosing students' mental health issues and for releasing students from school, never formed adequate bonds with staff, and missed a key meeting without providing notice that she would need coverage. As Erickson sees it, her supervising principal, Niya White, overstates Erickson's professionalism issues, overlooked black, male employees' comparable misconduct, and punished Erickson for taking work leave to observe Passover.

Erickson's bout with the school drove her to this Court. She sues Center City Schools and White for race, gender, and religious discrimination, as well as retaliation under federal and D.C. law. Defendants move for summary judgment on all counts. Because triable issues remain regarding her race and gender discrimination claims but not her religious discrimination or retaliation claims, the Court grants in part and denies in part the motion.

**I.**

Erickson, a white, Orthodox Jewish woman, began working as a counselor at the Congress Heights campus of Center City Schools at the start of the 2022–23 school year.  Defs.' Stat. Mat. Facts (Defs.' SMF) ¶¶ 1–2, ECF No. 23-3; Pl.'s Stat. Mat. Facts ("Pl.'s SMF") at 1, ECF No. 24-1.  After nearly two school years there, Center City Schools officials declined to renew her contract for the next school year.  Defs.' SMF ¶¶ 2, 4; Pl.'s SMF at 1.  Erickson's two-year tenure included a few mishaps.  During her first year, White conducted Erickson's performance review and awarded her 2s and 3s on scale of 1 to 4.  Pl.'s SMF at 3; Defs.' Resp. Pl.'s SMF at 21, ECF No. 26.  From White's perspective, Erickson's work had already fallen below expectations, but because "it was her first year," White decided to "give her a chance" to improve.  Pl.'s White Dep. at 62:18–63:05, ECF No. 24-6.  When White held another performance review a year later, she gave Erickson similar ratings, and told her that, to improve, she needed to form better relationships with faculty and parents and engage in more family outreach.  Pl.'s SMF at 3; Defs.' Resp. Pl.'s SMF at 22.

Time passed, White's concerns did not.  In early 2024, Erickson diagnosed a student as possibly having attention deficit hyperactivity disorder, but White told Erickson that diagnosing a student without a doctor or qualified supervisor violated school protocol and put the "school at risk."  Pl.'s SMF at 4; Defs.' Resp. Pl.'s SMF at 24.  A month later, Erickson interviewed a student who had suicidal ideations, so she contacted a social worker, determined that the student should be picked up from school, and called that student's father even though he was not listed as an emergency contact or authorized pick-up person.  Supp. May 8, 2024, Meeting Tr. at 12:12–13:22, ECF 25-6.  White and Vice Principal Aaron Cardwell again reprimanded Erickson—this time for failing to send them her suicide-risk assessment and for violating school

pick-up policy.  Pl.'s SMF at 4–5.

Scheduling mishaps related to Erickson's leave for the Jewish holiday Passover made matters worse.  On April 8, 2024, Erickson requested time off work to observe Passover, which lasted from April 22 through April 30, and White approved leave.  Pl.'s SMF at 2, 5; Defs.' Resp. Pl.'s SMF at 27.  Earlier that month, Erickson and counselors from other Center City schools had met "to discuss the date that [they] were all going to meet" to "determine the winners" of student awards.  Defs.' Erickson Dep. at 65:07–65:09, ECF No. 23-10.  They landed on April 30, and Erickson did not object.  Pl.'s SMF at 5; Defs.' Resp. Pl.'s SMF at 26.  As it turns out, however, Erickson could not and did not attend the April 30 meeting because it fell on Passover.  Pl.'s SMF at 5.

As an Orthodox Jew, Erickson testified that during Passover, she does not use electronics, including phones, laptops, and lights.  *Id.*; Defs.' Erickson Dep. at 66:01–66:06.  Away from her laptop's calendar reminders and online meeting platforms during Passover, Erickson missed both a meeting invitation (pushed on April 28) and the April 30 meeting itself.  Pl.'s SMF at 5–6.  She never warned her fellow counselors or other school officials about the schedule conflict.  Supp. May 8, 2024, Meeting Tr. at 05:01–05:10.

School officials were not pleased.  Cardwell explained that lost opportunity for the school's students to win awards "personally hit" White.  Defs.' Supp. Cardwell Dep. at 36:08–36:09, ECF No. 25-4.  To keep the students from losing out, Cardwell and White had "to figure out how to get" the student awards "nominations in after the meeting."  *Id.* at 36:09–36:11.  Erickson's mix up was the last straw.  Once she returned to work after Passover, White and Cardwell told her that Center City Schools would not renew her contract for the next year.  Pl.'s SMF at 6.  Erickson recalls White stating in this encounter that the missed meeting was "an

example of [her] not having good adult relationships" and her failure to "communicat[e]." Defs.' Erickson Dep. at 119:01–119:07.

In an email exchange following her termination, Erickson told White that she "was taken aback" that missing a meeting occurring "well into [her] Holy Day observance" could result in "not being invited back for the upcoming school year." May 2, 2024, Email Exchange at 2–3, ECF No. 23-13. White responded that the termination "had nothing to do" with religion, but rather that Erickson did "not communicat[e] with [White] or anyone else" about her conflict in advance so that another official could "be present in [Erickson's] absence to advocate for the students." *Id.* at 1. White added that in "two" prior "formal debrief meetings," she "shared concerns" with Erickson about her performance. *Id.* Those concerns ranged from failing to hold meetings with parents of students with attendance issues, violating pickup protocols, violating protocols for diagnosing student health issues and disabilities, and failing to form positive relationships with staff and parents. *Id.*

About a week later, White and Erickson had an in-person follow up meeting. There, Erickson stated that "[she] understand[s] there was no discrimination intended" when the school declined to renew her contract but that the decision's "timing"—just after Passover—"was not great." May 8, 2024, Meeting Tr. at 03:06–03:08, ECF No. 23-14. Once more, White responded that the school had no issue with her Passover leave. *See id.* at 03:09–04:19. The problem, White emphasized, was that Erickson never told anyone that she was "not going to be able to make it" to the awards meeting, whatever the reason for her absence. *Id.* at 4:16–4:22. When White asked Erickson about why, weeks before Passover, Erickson agreed to a meeting she could not attend, Erickson answered that she did not "even respond" to her counselor colleagues' suggested time because she "was not sure about the date at the time" and did not "have [her]

4

planner in front of [her]." *Id.* at 04:08–04:15. Back-and-forth ended after that meeting, and Erickson's contract went unrenewed. *See id.*; Pl.'s SMF at 1.

These events drove Erickson to this Court. Several months after the contract non-renewal decision, she filed an employment discrimination charge with the Equal Employment Opportunity Commission. *See* Compl. ¶ 7, ECF No. 1. After the issuance of a right-to-sue letter, *id.* ¶ 8, Erickson turned to this Court, suing Center City Schools and Principal White, *see id.* at 1. She claims Defendants discriminated against her based on her religion, race, and gender in violation of the D.C. Human Rights Act. *Id.* ¶¶ 71, 83, 95; D.C. Code §§ 2-1401 *et seq.* She brings these same claims against only Center City Schools under Title VII of the Civil Rights Act of 1964. Compl. ¶¶ 50, 56, 62; 42 U.S.C. §§ 2000e *et seq.* And finally, Erickson brings a retaliation claim against only Center City Schools under the D.C. Contractor and Instrumentality Whistleblower Protection Act. Compl. ¶¶ 105–109; D.C. Code §§ 2-223.01 *et seq.* She seeks a variety of relief including either reinstatement to her position or full pay and benefits, damages, injunctive and declaratory relief, and attorneys' fees. *Id.* 15–16. Defendants moved for summary judgment. Mot. Summ. J., ECF No. 23. Their motion is ripe. The Court turns to it now.

## II.

Summary judgment is appropriate if Defendants show that "there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it could alter the outcome of the suit under the governing substantive law and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Defendants bear the burden of "identifying those portions of the [record] which [they] believe[]

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up). If they do so, the burden shifts to Erickson to point to "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (cleaned up). Erickson's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. But she cannot "rest upon the mere allegations or denials of [her] pleading." *Id.* at 248 (cleaned up).

### III.

The Court has jurisdiction over all of Erickson's claims. Jurisdiction over her federal-law claims exists under 28 U.S.C. § 1331. And the Court has supplemental jurisdiction over her D.C.-law claims. *See* 28 U.S.C. § 1367. The Court takes the merits of each of Erickson's discrimination and retaliation claims in turn. It concludes that Defendants are entitled to summary judgment as to Erickson's retaliation and religious discrimination claims but not her race and gender discrimination claims.

### A.

Consider first Erickson's employment discrimination challenges. She alleges race, gender, and religious discrimination under both federal and D.C. law. Pl.'s Opp'n Mot. Summ. J. ("Pl.'s Opp'n") at 9, ECF No. 24. Courts decide these claims under the same framework. *See McFarland v. George Washington Univ.*, 935 A.2d 337, 346 (D.C. 2007) (explaining that the same three-part, burden-shifting test applies to Title VII discrimination claims and the D.C. Human Rights Act equivalent). To prevail, Erickson must establish that she "suffered an adverse employment action . . . because of [her] race, color, religion, sex, or national origin." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

In a case like this one, when a plaintiff seeks to show discrimination through

circumstantial evidence, not direct evidence, her claims trigger the familiar *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). Under that framework, the plaintiff must present a prima facie case of discrimination before the burden shifts to the defendant. *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015).

In this Circuit, however, when a defendant offers a legitimate, nondiscriminatory reason for its actions, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Instead, the Court must consider whether the plaintiff "produced enough evidence for a reasonable jury to find that the defendant[s] intentionally discriminated against [her]." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 92 (D.D.C. 2019), *aff'd,* 831 F. App'x 513 (D.C. Cir. 2020); *see Wheeler*, 812 F.3d at 1114.

Defendants offer such a justification. They maintain that Erickson's unprofessionalism—not her religion, race, or gender—prompted her termination. *See* Mot. Summ. J. at 16. Among the nine shortcomings Defendants list are Erickson's violations of protocols concerning student pickup, student disability diagnoses, student cell-phone use, and suicide-risk reporting. *Id.* They add that she failed to schedule student-attendance meetings with parents, and more generally, never developed trusting relationships or good communication with them. *Id.* Rounding out these issues, Defendants add that Erickson inadequately managed her schedule and caused "communication breakdowns" with staff. *Id.* Given these "legitimate, non-discriminatory reason[s] for the decision," *Brady*, 520 F.3d at 494–95, the Court skips to the third *McDonnell Douglas* step. *Wilson*, 417 F. Supp. 3d at 92. It asks whether Erickson produced enough

evidence for a reasonable jury to find that Defendants intentionally discriminated against her. *Id.* Erickson has not done so for her religious discrimination claim, but she has for her race and gender discrimination claims. The Court considers each theory separately.

*Religious discrimination.* No reasonable juror could find that Defendants' stated reasons for declining to renew Erickson's contract were a mere pretext for religious discrimination. The crux of this discrimination theory revolves around Erickson's Passover leave, her resulting absence at the counselors' meeting, and the fallout that followed. Pl.'s Opp'n at 12–13. Erickson offers no other instances of religious discrimination. Defs.' Erickson Dep. at 67:01– 67:07 (confirming, that aside from the "incident" following her Passover leave, Erickson knew of "no other" instances of religious discrimination against her).

Recall what happened as Passover approached. A few weeks earlier, Erickson requested work leave from White, who approved the request. Pl.'s SMF at 5; Pl.'s White Dep. at 87:14– 87:22. Shortly after, and still well before Passover's start, Erickson and her counselor colleagues from neighboring schools met to schedule a future meeting to discuss student award nominees. Pl.'s SMF at 5; Defs.' Erickson Dep. at 64:22–65:09. The group landed on an April 30 meeting date, and Erickson did not object. *See* Pl.'s SMF at 5. Weeks went by, and Erickson never mentioned a conflict to her fellow counselors, to White, or to any other school staff member. *See id.*; Defs.' Erickson Dep. at 112:02–112:06. On April 22, Passover began and so did Erickson's work leave. Pl.'s SMF at 5. According to Erickson, this meant she was away from all electronics. *Id.* Come the evening of April 28 (in the middle of Passover), a calendar reminder for the April 30 meeting appeared in Erickson' s email, but given Erickson's offline status, she missed the invitation. *Id.* Because no other school official knew about the meeting (the peer counselors, recall, came from other schools), no one from the Congress Heights campus filled in.

Defs.' White Dep. at 88:14–88:19, ECF No. 23-4. Without anyone to vouch for Congress Heights students, White and Cardwell had to go through extra hoops to get their students' names on the list after-the-fact. Defs.' Supp. Cardwell Dep. at 36:09–36:11. When White returned to work on May 1, White and Cardwell let Erickson know that the school would not renew her contract for the next year. Pl.'s SMF at 6.

This series of events tracks Defendants' stated nondiscriminatory reasons for Erickson's contract non-renewal. As White put it when confirming to Erickson the reasons for the decision, the counselor meeting debacle was "**an example** of [her] not communicating with [White] or anyone else" about a scheduling conflict. May 2, 2024, Email Exchange at 1 (emphasis in original). The decision "had nothing to do" with her religion and everything to do the school's missing "representation at the meeting." *Id.* In that same email, White listed several "concerns" Erickson knew about from prior "debrief meetings." *Id.* During an in-person follow up meeting a week later, Erickson even told White that she "understand[s] there was no discrimination intended" by White's response to Erickson's Passover absence. May 8, 2024, Meeting Tr. at 3:06–3:07. No reasonable juror could find from this series of events that Defendants chose not to renew Erickson's contract because she observed Passover.

Erickson's contrary arguments wither on examination. First, she discounts White's frustration with her communication failures, emphasizing that she "submitted her leave request" well in advance and that "White approved" it. Pl.'s Opp'n at 14. As Erickson sees it, White herself "could have informed the other counselors that Erickson would be absent from the scheduled meeting, or arranged for coverage herself." *Id.* But White did not know Erickson needed coverage. As White testified, no one "kn[e]w to cover her for not being there." Defs.' White Dep. at 88:18–88:19. Erickson never contends that White knew about the meeting, and

nothing in the record suggests she did.  From White's perspective, Erickson's failure to raise the absence with others was the central problem.  *See, e.g.*, May 8, 2024, Meeting Tr. at 04:16–04:21 (White explaining that Erickson should have flagged that she was "not going to be able to make it" during their in-person meeting a week later); May 2, 2024, Email Exchange at 1.  Erickson's premise that White had to ferret out the conflict on her own and proactively address it asks for more than discrimination law demands.  *Cf. Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 724 (8th Cir. 2008) ("We reiterate that antidiscrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." (cleaned up)).

Second, Erickson emphasizes that the school managed to nominate students for awards despite her absence.  Pl.'s Opp'n at 14.  That is true but irrelevant.  As Cardwell put it, Erickson's absence meant the school "had to figure out how to get [the] nominations in after the meeting," so they were "the last ones to have input."  Defs.' Supp. Cardwell Dep. at 36:10–36:13.  That White and other school officials eventually solved the problem Erickson created does not call into doubt that Defendants "honestly believe[d]" Erickson's communication lapse fell below the school's standards.  *Fishbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (cleaned up).

Third, Erickson faults White for "accusing" her of sending emails while on leave and claims this accusation "reflects either a fundamental misunderstanding of, or indifference to, Erickson's religious practices."  Pl.'s Opp'n at 13.  This characterization exaggerates matters.  Erickson did in fact send a school-related email on April 24, 2024, which fell in the middle of Passover.  *See* April 24, 2024, Email at 1, ECF No. 25-3; Pl.'s Erickson Dep. at 115:15 –115:21, ECF No. 24-3 (acknowledging that an email from April 24 would have been sent during Passover).  So when White wrote to Erickson that she "sent other emails while [she was] out,"

10

White misunderstood nothing about Erickson's religion.  May 2, 2024, Email at 1.  She merely stated what happened.  And this April 24 email undermines Erickson's claim that she had to be incommunicado throughout Passover.

Fourth, Erickson claims that Cardwell said he would have "raised a red flag" if "Erickson were absent for more than three days," implying that Cardwell devalued her religious observance.  Pl.'s Opp'n at 13.  But this retelling omits the full context of what Cardwell said.  In answering a question about whether Erickson's Passover leave posed "some kind of issue," Cardwell answered that he "candidly" did not "remember the conversations" about her leave.  Defs.' Supp. Cardwell Dep. at 33:16–33:22.  He furthered that "just speaking in general" about taking time off, White considered "more than three days" to be "excessive," so absences longer than three days "raised a red flag."  *Id.*  Indeed, the Court sees no evidence that Cardwell ever questioned Erickson's absence.  So his unspecific impressions about the school's general leave policy provide no grounds to manufacture a religious discrimination claim.

More, Erickson offers no reason for connecting Cardwell's general statement to the school's decision not to retain her.  *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) (discussing a "cat's paw" theory of liability under which an employer is "liable for the animus of a supervisor who was not charged with making the ultimate employment decision" (cleaned up)).  There is no sign that White, who with human resources officials made the contract non-renewal decision, faulted Erickson for taking too many days off.  *Id.*; Defs.' White Dep. at 60:09–60:13 (describing human resources officials involved in the decision not to retain Erickson); *id.* at 64:08–64:20 ("collecti[ng]" reasons for non-renewal).  To the contrary, White promptly approved Erickson's leave, and when conflict later ensued, White never suggested that Erickson took too much leave—only that she failed to alert others about the meeting she would miss

11

during her leave.  *See* Defs.' White Dep. at 88:04–88:15.

Last, Erickson zeros in on "temporal proximity," emphasizing that White handed down the contract non-renewal decision as soon as Erickson returned from her Passover leave.  Pl.'s Opp'n at 13.  But "temporal proximity alone is insufficient to establish pretext."  *Jeffries v. Barr*, 965 F.3d 843, 862 (D.C. Cir. 2020).  With no evidence beyond "mere proximity," Erickson has not "defeat[ed] the presumption that the proffered explanations are genuine."  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).  Defendants are thus entitled to summary judgment on the religious discrimination claim.

*Race and gender discrimination*.  Erickson's other discrimination claims tell a different story with a different ending.  This time to undermine Defendants' stated reasons for declining to renew her contract, Erickson points to two "other employees of a different race" and "sex," who she claims Defendants "treated . . . more favorably" in similar circumstances.  *Brady*, 520 F.3d at 495; Pl.'s Opp'n at 16; *see* 1 Lex K. Larson, Employment Discrimination § 8.04, at 8–66 (2d ed. 2007) ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment.").  As proposed comparators, Erickson offers Vice Principal Cardwell, and Sean Crowe, a fifth-grade math teacher.  Pl.'s Opp'n at 16; Defs.' SMF ¶¶ 35, 38.

To prove that she is similarly situated to these two employees, Erickson "must demonstrate that [she] and the allegedly similarly situated . . . employee[s] were charged with offenses of comparable seriousness."  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (cleaned up).  She "must also demonstrate that all of the relevant aspects of her employment situation were nearly identical to those of the [other] employee[s]."  *Id.* (cleaned up).  "Factors that bear on whether someone is an appropriate comparator include the similarity of the

12

plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015).

The D.C. Circuit acknowledges that "the mere fact that two employees had different titles and duties does not necessarily undermine the probative value of their different treatment" for a discrimination claim. *See id.*, 801 F.3d at 302. It also has rejected the notion that "employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated," especially where the comparator has committed a "different but more serious" offense. *See Wheeler*, 812 F.3d at 1118 (cleaned up).

A couple of illustrative cases clarify these guideposts. Consider first the D.C. Circuit's approach to proposed comparator employees with different jobs in *Burley v. National Passenger Rail Corporation*, 801 F.3d 290 (D.C. Cir. 2015). In that case, Burley, a black train engineer, sued Amtrak for race discrimination after he was fired over a train derailment. *Id.* at 294–95. Burley claimed that racial discrimination motivated the decision, and as part of his argument, he pointed to the train conductor, a white employee who was part of the same derailment and was disciplined less severely. *See id.* at 300–01.

His argument failed, but not simply because his coworker had a different job title. To the contrary, the D.C. Circuit recognized that, "as a general matter," employees with "different responsibilities and titles" may serve as proper comparators where they engage in "similar conduct and [are] governed by the same rules." *Id.* at 302; *see also Coleman v. Donahoe*, 667 F.3d 835, 848–49 (7th Cir. 2012) (finding a triable issue about proposed comparators despite their different positions because they "were subject to the same standards of conduct, violated the same rule, and were disciplined by the same supervisor"); *Mann v. WMATA*, 168 F. Supp. 3d

13

71, 84 (D.D.C. 2016) (observing that the D.C. Circuit has "embraced the principle" that employees of "different ranks" may serve as proper comparators). This general rule did not apply to Burley's situation, however, because he and his proposed comparator had "different roles" in the same train derailment and thus "bore different responsibility for causing" it. *Id.* at 301–02. Their varying culpability meant they did not engage in conduct "of comparable seriousness." *Id.* More, his fellow employee did not face "discipline[] by the same supervisors who disciplined Burley." *Id.* at 301–02. His coworker was thus an improper comparator.

Now, bring in *Wheeler v. Georgetown University Hospital*, 812 F.3d 1109 (D.C. Cir. 2016), for similarly situated employees who committed different offenses. *Wheeler* concerned a black nurse's termination following reports of several patient-care mistakes. *Id.* at 1112. Wheeler tried to discredit the hospital's justification for her termination "by showing that nurses of other races . . . were not disciplined as severely for similar conduct." *Id.* at 1115. It worked. The hospital, in firing Wheeler, stated that she left a patient's intravenous bag empty, failed to properly record patient vital signs, and neglected multiple patients, who were then either left slouched over and unable to move or sitting in their own waste. *Id.* at 1112. Comparator nurses faced discipline for other offenses including miscalculating drug dosages, failing to document a "patient's changed mental status," and withholding prescription medication contrary to a doctor's orders. *Id.* at 1115. Despite different conduct, all nurses "were subject to the same decision makers as Nurse Wheeler," *id.* at 1116, so the Circuit determined that a jury could reasonably conclude that her peer nurses served as proper comparators, *id.* at 1119.

These cases confirm that a triable issue remains as to whether Erickson is similarly situated to either Cardwell or Crowe. Viewing the evidence in the light most favorable Erickson, as the Court must, Vice Principal Cardwell posted a salacious TikTok and only had to agree to

14

remove the post.  *See* Pl.'s Cardwell Dep. at 57:01–57:14, ECF No. 24-5 (Cardwell testifying that following reports of his shirtless TikTok posts, he "had to sign a contract saying that [he] would delete the post and the account").

Fifth-grade math teacher Crowe, meanwhile, was also unprofessional and never disciplined.  Erickson often "would hear him yelling very loudly at the students" even though she worked on a different floor from Crowe.  Pl.'s Erickson Dep. at 137:11–137:13; *id.* at 137:18–137:19 (Erickson: "I'm saying he screamed so loud, I could hear him throughout the whole school.").  She also alleges, and Defendants do not dispute, that Crowe neglected his classroom, had students with lower test scores, and missed meetings.  Pl.'s SMF at 10–11; Defs.' Resp. Pl.'s SMF at 19.  Corroborating that account, Center City Schools's corporate designee alluded to staff issues with Crowe in her testimony.  In answering whether employees raised concerns about Crowe, she conceded that "this is a tough question" because Crowe is "quirky" so some "may complain" if they do not "align[] with his quirk."  Defs.' Dickens Dep. at 63:14–63:20, ECF No. 25-8.

Despite their run-ins with the school or its students, neither Cardwell nor Crowe faced repercussions to the degree Erickson did.  Though each had a different job title from Erickson, their positions provide no "self-evident explanation for their more lenient punishment," (or lack thereof, in Crowe's case).  *See Coleman*, 667 F.3d at 849; *cf. Burley*, 801 F.3d at 302 (concluding that job responsibilities explained different culpability and thus differential treatment).  And though each engaged in different kinds of misconduct, posting unprofessional videos online, leaving classrooms unattended, and yelling at students are arguably as serious as Erickson's various blunders.  *See Wheeler*, 812 F.3d at 1118.  And like Erickson, both Cardwell and Crowe reported to White.  *See id.* at 1116–18 (explaining that nurses working in "a different

unit and under a different clinical manager" from the plaintiff could still provide "meaningful comparison" based in part on a clinic director's supervisory role over all relevant units); Pl.'s Cardwell Dep. at 16:03, 67:22–68:02. These facts, viewed favorably to Erickson, suffice to create a "question of fact" as to whether she, Cardwell, and Crowe are "are similarly situated." *Wheeler*, 812 F.3d at 1115 (cleaned up). Summary judgment is thus improper.

Defendants barely engage with Erickson's proposed comparators. They assert only that both Cardwell and Crowe "had different job duties" and committed different offenses. Mot. Summ. J. at 15–16. But as the Court has explained, neither of these features dooms a plaintiff's proposed comparators. And Defendants provide no additional reasons why this fact-bound inquiry cuts in their favor. This shortcoming proves fatal. "The burden is always on the movant to demonstrate why summary judgment is warranted." *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (cleaned up). Without further explanation of why Crowe and Caldwell fail to serve as meaningful comparators, Defendants have not met that burden.

Trying a different angle, Defendants urge the Court to skip the comparator analysis altogether. They instead emphasize that Erickson "testified that she never experienced any negative comments about her gender, nor could she identify any examples of a time when she was treated differently because of her gender." Mot. Summ. J. at 15. They say the same about her race discrimination claim. *Id.* at 18 (arguing that Erickson "openly admits that she was never treated differently because of her race"). Given these concessions, the argument goes, Defendants are entitled to summary judgment on both scores.

A closer look at the record, however, reveals a different story. Consider the portions of Erickson's testimony on which Defendants rely. When asked if she could provide "a specific example of a time where [she was] treated differently than another employee at Congress

16

Heights because [she was] female," Defs.' Erickson Dep. at 126:14–126:17, Erickson confirmed that she could and listed Crowe and Cardwell as "male," "African American" employees who "acted unprofessionally and yet . . . remain[] employed" at Congress Heights. *Id.* at 126:18–127:07. True, she clarified that neither Crowe nor Cardwell themselves treated her more poorly on account of her gender, *id.* at 129:12–129:18, 131:18–132:03, and that "[o]ther than Principal White," she cited no instances "where an employee treated [her] differently" on account of her race, *id.* at 132:14–132:18. But one cannot, as Defendants do, extrapolate from those answers that Erickson conceded her race and gender discrimination claims altogether. How Crowe and Cardwell treated Erickson is beside the point. The crux of Erickson's allegations concerns White's treatment of Erickson versus White's treatment of Crowe and Cardwell. Misconstruing testimony will not defeat Erickson's claims.

*     *     *

In sum, no triable issues remain for Erickson's religious discrimination claim, so Defendants are entitled to summary judgment on it. For her gender and race discrimination claims, however, Defendants have failed to show they are entitled to summary judgment as a matter of law. In reaching this conclusion, the Court draws no conclusions about the persuasive value of Erickson's evidence or race and gender discrimination theories. At the summary judgment stage, judges "may not make credibility determinations, weigh the evidence, or draw inferences from the facts—these are jury functions . . . ." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005). The Court holds only that in "view of all the evidence," it "cannot say that no rational and reasonable jury could find" Crowe and Cardwell "comparable" to Erickson. *See Wheeler*, 812 F.3d at 1119. Summary judgment is thus inappropriate.

**B.**

The Court now turns to Erickson's remaining claim: that Center City Schools retaliated against her in violation of the D.C. Contractor and Instrumentality Whistleblower Protection Act ("Whistleblower Act").  D.C. Code §§ 2-223.01 *et seq.*; *see* Compl. ¶¶ 101–12.[1]  Erickson bases this claim on her disclosure to Cardwell and White that two students had suicidal ideations.  Pl.'s Opp'n at 25.  She claims that, by reprimanding her for how she handled those incidents and disagreeing with her assessment, Center City Schools "sought to reduce cases of reported suicidal ideation for fear of reputation harm or scrutiny."  *Id.* at 26.  Erickson's theory invokes the Whistleblower Act for a claim ill-suited to it.  Center City Schools is thus entitled to summary judgment on the point.

The Whistleblower Act is "designed to combat serious misconduct, abuses of governmental authority, or waste of public resources by creating an environment in which government employees who witness wrongdoing feel safe coming forward and are protected from retaliation."  *Coleman v. District of Columbia*, 794 F.3d 49, 53 (D.C. Cir. 2015); *see* D.C. Code § 1–615.51; *see also id.* §§ 2-223.01–2-223.07 (extending similar protections to employees of contractors for the D.C. government).  To serve that aim, the Act prohibits supervisors from retaliating "against an employee because of the employee's protected disclosure . . . ."  D.C. Code § 2-223.02.  In doing so, the Act encourages "disclosure of wrongdoing to persons who may be in a position to act to remedy it."  *Coleman v. District of Columbia*, 794 F.3d at 53 (cleaned up).

Not all disclosures amount to protected whistleblowing.  Complaints that trigger protection "must disclose such serious errors by the agency that a conclusion the agency erred is

---

[1]  Recall that Erickson brings this claim against only Center City Schools.  *See* Compl. at 14.

18

not debatable among reasonable people." *Wilburn v. District of Columbia*, 957 A.2d 921, 925

(D.C. 2008) (cleaned up).  The Whistleblower Act defines the "[p]rotected [d]isclosure[s]" that

trigger protection from retaliation as those a purported whistleblower "reasonably believes"

show:

> (A) Gross mismanagement;
> (B) Gross misuse or waste of public resources or funds;
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6).  As courts routinely state, the Act focuses on disclosures that reveal

"government" wrongdoing.  *See Ishakwue v. District of Columbia*, 278 A.3d 696, 707 (D.C.

2022); *Williams v. District of Columbia*, 9 A.3d 484, 491 (D.C. 2010) (explaining that the

Whistleblower Act concerns "information indicating that [an agency] committed such serious

errors" (cleaned up)); *Harris v. D.C. Water & Sewer Auth.*, 172 F. Supp. 3d 253, 261 (D.D.C.

2016) (explaining that the Whistleblower Act concerns beliefs about whether a "D.C.

government agency" engaged in gross mismanagement, waste, or fraud).

Erickson's "disclosure" falls outside this coverage.  She never complained of or

otherwise exposed wrongdoing by Center City Schools.  The only "disclosure[s]" she identifies

are her reports to Cardwell that two students had suicidal thoughts.  Pl.'s SMF at 5.  However

sensitive that information may be, it does not concern the school's conduct and thus does not

trigger Whistleblower Act protection.  That is so even if, as Erickson argues, Center City Schools

discouraged her suicide-risk diagnoses "for fear of reputation[al] harm or scrutiny."  Pl.'s Opp'n

at 26.  Reporting potential dangers about specific students *to* school officials is far afield from

reporting "wrongdoing" *by* school officials.  *See Coleman v. District of Columbia*, 794 F.3d at

53. The Whistleblower Act covers the latter category, and Erickson's case involves only the former. *Cf. Craig v. Not for Profit Hosp. Corp.*, 626 F. Supp. 3d 87, 104 (D.D.C. 2022) (finding an adequate protected disclosure allegation where plaintiff reported a hospital superior for pressuring doctors to violate federal regulations). Perhaps if her complaint was about a school coverup of suicidal students, things would be different. But that was not her complaint.

Seeing things differently, Erickson claims that all that matters to trigger Whistleblower Act protection is that she *believed* the information she disclosed fell within the Act's protected disclosure categories. Pl.'s Opp'n at 24–25. True, in Whistleblower Act cases, plaintiffs prove a protected disclosure if they reveal information they "reasonably believe evidence[] one of the § 1–615.52(a)(6) categories of disclosures." *District of Columbia v. Poindexter*, 104 A.3d 848, 854 (D.C. 2014) (cleaned up). But that standard does not help Erickson. To determine whether an employee reasonably believed that her disclosure triggered Whistleblower Act protections, courts ask whether a "disinterested observer" could "reasonably conclude that the actions of *the government* evidence" one of the protected categories. *Id.* (cleaned up) (emphasis added). No "disinterested observer" would conclude that in reporting a student's mental-health issues to other school officials, Erickson somehow blew the whistle on "the government" entity for which she worked. *Id.* (cleaned up). Summary judgment on her retaliation claim is thus proper.

**IV.**

For these reasons, Defendants are entitled to summary judgment on Erickson's retaliation and religious discrimination claims.  Triable issues remain, however, for Erickson's race and gender discrimination claims.  Accordingly, the Court **ORDERS** that the [23] Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

Dated: July 23, 2026                                   TREVOR N. McFADDEN, U.S.D.J.